## Case No. 10,704.

### PANAUD v. UNITED STATES.

[Hoff. Op. 469; Hoff. Dec. 18.]

District Court, D. California. Oct. 2, 1860.

MEXICAN LAND GRANT—MISSION LANDS — PUBLIC DOCUMENTS—CIRCUMSTANCES OF SUSPICION.

[J. A. petitioned Governor Pico for certain of the lands belonging to the mission of San Jose, and claimed by him to have been abandoned by the mission. Upon this petition, the governor made a marginal decree ordering the alcalde to put the petitioner into possession and to make report of the condition of the lands, so as to determine the amount to be paid to the mission by the petitioner as indemnity. The alcalde made his report, and subsequently J. A. petitioned for final decree. These were all the documents found in the archives. From his private possession the claimant produced the testimonio of the act of possession given by the alcalde, and also the final decree of title from the governor, purporting to grant to the petitioner and to A. P. (a brother of the governor) the lands in question. This grant was said to have been made at a time a few weeks following the receipt by the governor of the letter from the supreme government positively prohibiting the granting of mission lands, and which letter the governor had communicated to the departmental assembly. A claim had, before this suit, been declared spurious by the court which attempted to set up a grant to the same parties of the whole of the San Jose mission lands, which spurious title was of a date 20 days prior to the date of the title in this case. Held, that the claim is spurious in view of the improbability of the governor's violating, so soon after its receipt, the command of the supreme government, and of the suspicious circumstances surrounding the alleged grant (and especially the custody from which the title was produced), and the further improbability that the parties would petition for a grant of lands covered by an older grant to them, and

[the insufficiency of the confirmatory evidence produced by the claimant.]

[Claim by Clement Panaud and others to the garden of San Cayetano, a part of the mission lands of San Jose. The grant, it was claimed, was for 100 varas, and was made to Juan B. Alvarado and Andres Pico.]

HOFFMAN, District Judge. The claim in this case is for the orchard of San Cayetano, and adjoining land, formerly within the mission of San Jose. The evidence offered in support of the claim is as follows:

(1) A petition, signed by Juan B. Alvarado and addressed to Pio Pico, dated March 11, 1845. In the petition Alvarado states that he is desirous of establishing a house within the limits of the mission of San Jose, where there are already some individuals residing, by permission of the governor's predecessors, who have also received grants or lots according to their petitions. He therefore asks for "100 varas of land in the vicinity of the main building, and including an orchard of trees and a vineyard which is contiguous to said lot, but separate from the principal one of the mission, as this property is almost completely abandoned, offering, nevertheless, to indemnify or satisfy the natives or the government for the value of said plants, as has been done by other persons when the government has granted them vacant houses at the mission of Santa Clara and other places, on account of their being in the condition which I have stated,—for which purpose, and in order to avoid delays, etc., I suggest to your excellency, if you should think fit, to take the information which you may think necessary from persons who are actually in this city (Los Angeles), who are persons living in that neighborhood, in relation to what I solicit," etc. (2) The marginal decree of Governor Pico on this petition, dated March 12, 1845. In this petition the governor states that, "being convinced that it is for the prosperity of the department that the lands of the mission should pass into the hands of industrious individuals who may improve them, and also taking into consideration the decaying condition of the Indians, I decree and order that the respected judge put the señor colonel in possession of the 100 varas of land, orchard and vineyard, which he solicits; that the act of possession being concluded, the same judge shall send to this government a minute report, stating the actual condition of the orchard and vineyard which have been granted, as also the present petition and decree, in order that, in view thereof, the government may know what sum of money Señor Alvarado will have to pay over to the community of the mission of San Jose for the same, and that the title be issued." (3) The report of the alcalde of San Jose, Antonio Ma. Pico, in compliance with the foregoing decree, dated August 27, 1845. In this report the al-

calde states that, in obedience to the decree, he had given the possession therein mentioned to the señor colonel of militia, Juan B. Alvarado, represented by his agent, of which act of possession he had given a "testimonio," or certified copy, to the interested party. The alcalde thereupon proceeds to give a minute account of the condition of the orchard, vineyard, etc., stating the number of useful trees, vines, etc. (4) A petition by Alvarado to the governor, dated March 1, 1846. In this petition Alvarado states that) "having, by the determination of the government, obtained the favor of putting at his disposition the orchard called San Cayetano, of the property (de la putunencia) of the mission, I am now in possession of the same, and in order to be considered owner in full property thereof, it is necessary that the government should issue to me the corresponding title. I pray your excellency that you be pleased to decree accordingly, for which purpose I annex hereto the documents which are the evidence of the concession and possession of the same, representing to you, likewise, in order that your excellency may act with justice, that, on account of the ruinous condition of the property, it will not produce to your petitioner for some years to come enough to remunerate him for the expense of repairs, for which reason I offer in payment therefor, either to the Indians or to the government, the number of 200 head of meat cattle. Wherefore I pray, etc."

The signatures to the foregoing documents are testified to as genuine. They are all found among the archives, and, so far as I am informed, there is no reason to suspect their authenticity. The claimant has also produced from his own custody the certificate or testimonio of the act of possession given to him by the alcalde. The genuineness of this document is sworn to by the alcalde, and the agent of Alvarado, to whom the possession was given as stated by the alcalde in his report, is also produced, and confirms the report in that particular. The claimant also produces the final title, dated May 25, 1846, and alleged to have been issued as prayed for in Alvarado's petition of March 18, 1846, except that, in pursuance of an arrangement between him and Andres Pico, the title is in favor of both jointly. It is also testified by Alvarado that the title was issued to him and Andres Pico, and that the latter paid to the government 200 head of cattle, or thereabouts.

It will be observed that the only evidence that the grant was issued consists of the production of the instrument itself. The book in which it is said to be noted is not found in the archives. Neither Pico, who is alleged to have made the grant, nor Morino, who signed it as secretary, have been examined as witnesses. The only evidence in support of it is the usual proof that the signatures are genuine. How it came to be

issued to Andres Pico and Alvarado jointly, and not to Alvarado alone, is not explained, except that Alvarado states he had an arrangement with the brother of the governor. But it is not a little singular that both of these alleged grantees should, in another grant, have pretended to be owners, not merely of the orchard, but of the whole mission of San Jose and its appurtenances. The grant produced in that case was dated May 5, 1846,—20 days previous to the grant now relied on,—and it purported to sell to Alvarado and Andres Pico, the grantees in this case, the mission of San Jose and its appurtenances. If the genuineness of that grant were established, it would be almost conclusive proof that the same parties could not have applied for and obtained, 20 days after its execution, another grant of part of the very land already granted to them, and have paid an additional consideration, viz. two or three hundred cattle for the additional title paper. That grant, however, was rejected by the court as spurious. But the fact remains that the same parties have, in another case, set up different title to the property claimed in this; and as one of the grants is spurious, the suspicion is naturally suggested that the other is of the same character. The documents themselves are, also, in some degree suspicious. If, on the petition of Alvarado, the governor determined to accede to it, it is singular, and a departure from an almost uniform practice, that the governor did not, on the margin of the petition, make some order or decree indicating the dispositions he intended to make in the premises. But the petition contains no such marginal order.

In the case of Larkin v. U. S. [Case No. 8,091], it was held by this court that, under the decree of 1840, and the positive instructions contained in the official letter, signed "Montesdioca," the governor had no authority to grant the cultivated and improved property belonging to the mission establishments. By the decrees of the departmental assembly of May 28, 1845, and March 30, 1846, the governor was authorized to lease certain of the missions, and if that were found to be impracticable, to sell them to the highest bidder. On the 15th of April, 1846, the letter of the Montesdioca, instructing the governor to suspend all further proceedings relative to the alienation of the missions, was communicated by the governor himself to the assembly. It is, therefore, not only highly improbable that the governor should have, within a few weeks thereafter, proceeded to do the very thing he was prohibited from doing, but, as already decided by this court, it is clear that he had no power to do it. When we consider the nature of this claim, the absence of any evidence from the archives that the grant issued, the fact that the usual marginal note is not found on Alvarado's petition, the introduction of the brother of the governor as a grantee, the facility with which the title could be manufactured and antedated, the fact that another title issued by the same governor in favor of the same parties, and including the same land, has already been found spurious, and that the pretended action of the governor was in direct violation of a positive order recently received by him, it is difficult to avoid the conclusion that both grants have a common origin and a similar character.

It is contended that the marginal order of the governor upon Alvarado's first petition, the possession given to him in pursuance thereof, and his subsequent occupation of the land constitute an equitable title, which the United States must respect. At the time of the acquisition of California by the United States the work of secularizing the missions, which had been begun under the decree of 1833, was by no means completed. The attempt of Figueroa and his successors to secure to the Indians some part of the cultivated land which their labors had improved had signally failed. Each successive regulation, having for its object to secure the faithful administration of the missions by the administrators and stewards in whose hands they had been placed, seems to have been without avail, and the governors continued to grant the lands belonging to those establishments, with but slight regard for the rights of indigenous inhabitants by whose labor they had been built, and among whom it was originally intended to distribute such lands as they might require when the missions should be converted into pueblos. But these extensive spoliations, to which these once flourishing establishments were subjected, did not merely deprive the Indians of the asylum and the means of support created by their labor, and promised to them when just reclaimed from savage life. The seizure by the administrators of the orchards, vineyards, etc., and even the mission buildings, left the padres and the secular clergy, by whom they were to be replaced, destitute of the means of support. The bishop of the Californias, therefore, addressed a memorial to the government, in which the disastrous effect upon the church of the policy which had been pursued was set forth, and the government, recognizing the justice of these representations, decreed on the 9th of November, 1840, "in conformity with everything the reverend bishop of the Californias had petitioned in his communication, and in conformity with the decree of the 7th November, 1835, which ordered the missions to be restored to their former condition," and it announced its intention to issue "a general order to the governor of the Californias for the restoration to the missionary father, without delay or impediment, of the possession and property used by them under their administration, for the conversion of the heathen." Among the earliest acts of Micheltorena was the issuing of a proclamation or decree that various missions, among which was that of San Jose, should be delivered up or restored to the

most reverend fathers who were to continue to govern them and take charge of the natives as before.

It is unnecessary to recapitulate the various decrees passed by the departmental assembly, authorizing the sale and the renting of the missions. I have been unable to discover from what source they derived any authority to empower the governor to deal with this portion of the public property. It is to be observed, however, that both the renting and sales were required to be made at public auction; and in the distribution of the proceeds, the claims of the church and the rights of the Indians were, in form at least, respected. For the conservation of divine worship, and the maintenance of the Indians, two-thirds of the proceeds of the rents were, by the decree of 28th October, 1845, to be devoted. By the decree of 28th October, 1845, the surplus of the proceeds of the sales therein authorized, after paying the debts of the missions, was to be placed at the disposal of the respective prelate for the maintenance of religious worship, and a disposition of the suits was made similar to that contained in the decree of May 28th, preceding. By the decree of March 30, 1846, the surplus of the purchase moneys was required to be distributed equitably amongst the Indians. The action of Pio Pico, therefore, in attempting to sell at private sale, to his brother and others, not merely the lands, but the houses and orchards made by the missionaries and their neophytes, and "contiguous to and in immediate communication with the churches," and which the supreme government had decreed "should remain to the use and benefit of the missionaries, in accordance with the petition of the bishop," was not only in violation of that decree, but unauthorized by the decrees of the departmental assembly, from which he pretended to draw his authority. That the supreme government so regarded it is evident from the order signed "Montesdioca," which peremptorily directs the governor to suspend all proceedings respecting the alienation of the mission property. That the departmental assembly so regarded it is evident from their decree of October 31, 1846, the 1st article of which provides that "the sales of missions made by Don Pio Pico as governor, as well as all other acts done by him on the same subject beyond his authority, are entirely annulled." This decree, though passed after the taking of Monterey, and what has been deemed the date of the conquest of the country, is, nevertheless, important as a practical construction of the validity of the governor's acts by the very body from which he professed to derive his powers.

From the foregoing, it results that the alleged inchoate or equitable title which, it is claimed, was conferred by the marginal decree of Pio Pico can have no greater validity than the final title, which, it is alleged, issued after the reception of the Montesdioca document. Neither the marginal decree nor the final title in this case could have issued in virtue of the authority conferred by the colonization laws of 1824, or the regulations of 1828. Alvarado had already received from the government all the lands which could, by those laws, have been granted to any individual. The fact, therefore, of occupation and settlement can add nothing to his equities, as might be the case if the grant had been a colonization grant, for which occupation and settlement furnished the only consideration. The transaction proposed was to all intents a sale, and the only circumstance which could strengthen the equitable rights of the claimant would be the payment of the price. But on this point the evidence is insufficient. No receipt for any sum, or any number of cattle is produced. The only evidence on the subject is the statement by Alvarado, that Andres Pico gave to the government 300 head of cattle or thereabouts. But the petition of Alvarado offers, and the grant accepts, 200 head of cattle as the compensation to be paid for the land. The recollection of Alvarado is thus at fault as to the number of the cattle, and when it is considered that, in the former case, for the mission of San Jose, the same parties were alleged to have paid $12,000 for lands within which the land now claimed is embraced, it is difficult to attach much credit to the bare statement of Alvarado that a payment was made in this case. That Alvarado did not himself consider the order directing the possession to be given to him as amounting to a title is expressly stated in his subsequent petition: "In order to be considered the owner in full property of the land, it is necessary that the government should issue to me the corresponding title, etc." That title, I thing, it is not satisfactorily shown that he ever obtained, nor do I consider the evidence of the payment of the price clear enough, nor the fact of his having occupied the ancient orchard and vineyard of the mission sufficiently to create any equitable title which the United States, who have already recognized, on the claim of the Roman Catholic bishop, the right of the church to the lands now claimed, are bound to respect. On both grounds, therefore, I think, the claim should be rejected:

1. Because the governor had no power to confer an inchoate title, or to make a final grant of the land. And

2. Because, if such power technically existed, it was in this case exercised in violation of the policy of the supreme government, the claims of the church, and the rights of the neophytes, as well as in entire disregard of the directions of the departmental assembly; and in the absence of satisfactory proof of the bona fide payment by the grantees of a reasonable equivalent for the concession, there can be no equitable obligation upon the United States to complete the grant by giving to the claimants the "title in full property."